**Percival B. Coffin, Administrator of the Estate of James MacDonald, Deceased, Appellee, v. City of Chicago, Appellant.**

**Gen. No. 33,439.**

Opinion filed July 3, 1929.

SAMUEL A. ETTELSON, Corporation Counsel, and WILLIAM D. SALTIEL, City Attorney, for appellant; CHARLES M. McDONNELL, Assistant City Attorney, E. MARSHALL AMBERG and ROY S. GASKILL, Assistant Corporation Counsel, of counsel.

JOHN J. COBURN and JOHN P. MCDONALD, for appellee.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

In an action commenced in the superior court of Cook county on April 16, 1926, against the City of Chicago and Thomas J. Duffy, for negligently causing the death of plaintiff's intestate, there was a trial before a jury in December, 1928, resulting in a verdict and judgment against the City for $5,000, and this appeal followed. Upon the first trial in June, 1928, Duffy on plaintiff's motion was dismissed as a defendant, a jury under the court's instruction returned a verdict finding the City not guilty, and a new trial was awarded.

Plaintiff's declaration consisted of three counts, to which the City filed a plea of the general issue. In the first count plaintiff averred that on June 7, 1925, defendant (City of Chicago) was possessed and had control of a public sidewalk on the west side of Racine Avenue (a north and south street) and south of West 47th Street, Chicago; that defendant also had control of a certain opening, metal railings supported by metal posts surrounding said opening, and a cement or stone stairway (about 30 feet south of West 47th Street) leading from said opening in said sidewalk on Racine Avenue to the basement of a building on the southwest corner of Racine Avenue and West 47th Street; that Duffy was the owner of the building, etc.; that it was the duty of Duffy and the City to keep and maintain the sidewalk, the opening therein, and the metal railings and posts surrounding the opening, in good condition and repair; that they negligently permitted the metal railings and posts surrounding the opening "to become rusted, and be and remain in a state of decay and weakened condition"; that they were in such condition for a long period of time prior to June 7, 1925, of which defendants had or by the exer-

cise of a reasonable diligence should have had knowledge; that on the day mentioned, while James MacDonald was in the exercise of due care and "while he was *casually leaning* against said metal railings so surrounding said opening," a part or section of the railings and posts "collapsed and gave way suddenly and without any warning to the said James MacDonald and precipitated him with great force into the opening and down upon and along the walls and floor thereof" whereby he was so greatly injured that he died on June 13, 1925; and that he left him surviving a widow and five sons (naming them), who are still living and who, by reason of his death, have been deprived of their means of support, etc.

The second count is predicated upon a claimed violation of an ordinance of the City of Chicago concerning *uncovered* openings in public sidewalks.

In the third count it is averred that the intersection of the two streets was a street car line intersection and transfer corner, where large numbers of people habitually leaned against or sat upon the railing; that defendants negligently permitted the railing to become in a state of decay and weakness from age and use so that it was unfit and unsafe to act as a guard or protection about the opening, and to so continue for a long space of time; and that, while plaintiff's intestate was standing upon the sidewalk and "was in the exercise of all due care for his own safety *leaning or partly supporting his body against said railing,* and in consequence of said negligence of defendants and said condition of the railing," it broke and gave way, and plaintiff's intestate fell, etc.

Upon the trial, the testimony of three of plaintiff's witnesses disclosed in substance that on Sunday afternoon, June 7, 1925, they and plaintiff's intestate, MacDonald, met in a "soft drink parlor" on the southeast corner of Racine Avenue and west 47th Street; that after having a few light drinks all crossed Racine Ave-

nue to the sidewalk on the west side thereof and to a point a short distance south of west 47th Street; that, while some or all were waiting to board a street car and all were engaged in conversation, MacDonald and David Barnes leaned against the railing, and, a post or posts and a portion of the railing giving way, both were precipitated into the areaway or basement below, falling a distance of about eight feet; and that Mac-Donald, who weighed about 190 pounds, sustained a skull fracture which caused his death a few days thereafter.

Defendants' witness, Harry Pryor, employed as a butcher at the City abattoirs, testified on direct examination: "On June 7, 1925, I lived up over Tom Duffy's place. . . . I was standing in front of the building, near the corner. . . . I noticed the accident. . . . There were three men together. . . . They came across from the other side of the street over to the side that I was on, and *two of them got up on this railing, and one leaned against it* and over went the railing. Two of them fell." In response to a question by the court as to where *MacDonald* was just prior to the accident, the witness replied: "Oh, sitting on the railing, with his feet upon the first rail." On cross-examination the witness testified: "Two of them were on the railing. . . . They got up and put their feet on the lower rail, and when the last one leaned against it, it went."

As to the construction and condition of the railings and posts David Barnes, plaintiff's witness and a machinist by trade, testified on direct examination that on the following day he examined them; that the posts were fastened with four lag screws; that there were pieces of iron pipe about eight feet long, with posts every eight feet, which posts were fastened into the sidewalk with expansion shells and lag screws; that he found that the lag screws were so rotted that "they were about as thin as a match"; that when part of the

railing went over the "heads broke off"; that they were "rusty"; and that the railing had been there to his knowledge for about five years. On cross-examination he testified as to the lag screws: "I did not see their size. You cannot see their size; all you can see is the head. *You couldn't tell they were rusty unless you had a hammer, and broke them off.*" He further testified that at the time of the accident "I didn't know they were rusty; the railing, by looking at it, *appeared to be solid*. . . . It was two pipes high— the first one being about 18 inches from the ground and the second about 36 inches. My body would strike against the top rail about at the small of my back." Fred Martin, plaintiff's witness, testified on cross-examination that just before the accident he "partly leaned" against the railing, and that it "did not seem to me to be loose."

Thomas J. Duffy, defendant's witness, testified that he was and had been for eight years the owner of the corner building and of the railing in question; that he did not see the accident; that the railing consisted of two iron pipes, which were about two inches in diameter and which extended through four iron posts; that the posts were fastened into the cement sidewalk by screws about four inches long into lead, drilled into the concrete walk; that the screws were square headed and "screwed in with a wrench"; that he did not know when the railing was originally erected; that he had had it painted about eight months before the accident; that one of the rails had been broken about a year before the accident and he had had it repaired; that he had frequently examined the entire railing before the accident, and that upon the last examination shortly before the accident he found it "solid" when he tested it and attempted to shake it; and that he had originally been made a party defendant but had been dismissed out of the case and "his liability settled." Defendant's witness, Thomas Johnson, an employee of Duffy at

the time of the accident, gave his version thereof. And he testified that the railing always appeared to him to be solid, that he examined it about a week before the accident, and that then it appeared safe and sound and did not "give any."

After reviewing the evidence we are of the opinion that the verdict is against the weight of the evidence on the question of the City's negligence. Plaintiff did not introduce any evidence showing that the City ever had received any actual notice that the railing was unsafe or defective. And we think that it appears from all the evidence, and particularly from the testimony of plaintiff's witness, Barnes, that there was a latent defect in the structure, not discoverable by the City in the exercise of ordinary care on its part. A municipality is not ordinarily liable for latent defects in sidewalks, or structures thereon or immediately adjacent which have been erected by others. In 43 Corpus Juris, p. 1051, sec. 1826, it is said: "A municipality is not an insurer against all defects, latent as well as patent, but its liability is for negligence, and injuries resulting from latent defects in a highway not due to faulty municipal work, and which could not have been discovered by ordinary care and diligence, do not give a right of action against the municipality in the absence of actual notice." And we understand this to be the law of this State. (*Karczenska v. City of Chicago,* 239 Ill. 483, 485; *Powell v. Village of Bowen,* 92 Ill. App. 453, 455.) In the *Powell* case it is said: "Mere existence of the defect which caused the injury is not enough to establish negligence. It is the failure to repair the defect after notice, actual or presumed, that constitutes the negligence sufficient to support a recovery." In the present case there was testimony to the effect that the railing upon examinations made shortly before the accident appeared to be firm and solid. Indeed; one of plaintiff's witnesses testified that it "did not seem to be loose." And under all the

evidence it is difficult for us to perceive how the City could be presumed to have had notice that some of the lag screws in the structure had become worn and rusty.

Counsel for the City also contended in substance that the judgment cannot stand because it appears that MacDonald and his companions, at and immediately before the time of the accident, were making an improper use of the structure or railing in that they were either leaning against or sitting upon it. In view of our above holding as to the insufficiency of the evidence on the question of the City's negligence, we do not deem it necessary to pass upon the contention. We may say, however, that there are authorities supporting the contention. (See *Stickney v. City of Salem,* 3 Allen [Mass.] 374; *Carlson v. City of Washburn,* 159 Wis. 619.) In 43 Corpus Juris, p. 1073, sec. 1848, it is said: "An improper use of a structure in a street will preclude recovery against the municipality. This rule has been applied to a person who leans against or sits upon a railing or barrier erected on the side of a street and is injured by reason of its defective condition, although a different view has been taken in some jurisdictions so far as merely leaning against a railing is concerned."

And we do not deem it necessary to discuss counsels' further contention, viz., that the court committed error in giving instruction No. 2, offered by plaintiff.

The judgment of the superior court is reversed and the cause remanded.

*Reversed and remanded.*

BARNES, P. J., and SCANLAN, J., concur.